United States District Court
Middle District of Florida
Tampa Division

**CYNTHIA ROSAS AMIEL,**

 *Plaintiff,*

v.                 NO. 8:20-cv-1658-PDB

**ACTING COMMISSIONER OF SOCIAL SECURITY,**

 *Defendant.*

___

# Order

 Cynthia Amiel brings this action under 42 U.S.C. § 405(g) to review a final decision of the Acting Commissioner of Social Security denying her application for disability insurance benefits. Doc. 1. Under review is a decision by an Administrative Law Judge (ALJ) signed on October 22, 2019. Tr. 43–62.

 Amiel argues the ALJ erred in determining her narcolepsy was nonsevere and in failing to adequately consider her fibromyalgia. Doc. 28. The Acting Commissioner contends there is no error. Doc. 29. The procedural history, administrative record, and law are summarized in the briefs, Docs. 28, 29, and not fully repeated here.

 The Social Security Administration (SSA) uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment or combination of impairments meets or equals the severity of anything in the regulatory listings, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her residual functional capacity (RFC), and (5) there are a significant number

of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

Here, the ALJ conducted a hearing in September 2019, at which Amiel—who was represented by counsel—and a vocational expert (VE) testified. Tr. 70–110. Afterward, the ALJ issued the decision under review, proceeding through the five-step sequential process.

At step one, the ALJ found Amiel had not engaged in "substantial gainful activity since August 4, 2017, the alleged onset date." Tr. 45 (emphasis omitted).

At step two, the ALJ found Amiel has severe impairments of fibromyalgia, spinal stenosis, Hashimoto thyroiditis, lupus, migraine headaches, and depression. Tr. 45. The ALJ found other impairments, including narcolepsy, nonsevere. Tr. 45–46.

At step three, the ALJ found Amiel has no impairment or combination of impairments that meet or medically equal the severity of any impairment in the regulatory listings. Tr. 46.

The ALJ found Amiel has the RFC to perform "less than the full range of light work":

> The claimant remains able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently. Stand or walk approximately 6 hours per 8-hour workday, and sit for approximately 6 hours per 8-hour workday with normal breaks. Never climb ladders, ropes, or scaffolds. Frequent all the other postural limitations including climbing ramps or stairs, balancing, stooping, crouching, kneeling, and crawling. The claimant must avoid concentrated exposure to extreme cold, excessive wetness, excessive vibration, and hazards. The claimant is limited to only understanding, remembering, and carrying out, and performing simple, routine tasks and instructions.

Tr. 47 (emphasis omitted).

At step four, the ALJ found Amiel cannot perform any "past relevant work." Tr. 60 (emphasis omitted).

At step five, the ALJ relied on the VE's testimony and found Amiel can perform jobs that exist in significant numbers in the national economy and thus is not disabled. Tr. 60–61.

A court's review of a decision by the Acting Commissioner is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoted authority omitted). The "threshold for such evidentiary sufficiency is not high." *Id.*

At step two, an ALJ considers whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (defining "non-severe impairment"). Basic work activities are the abilities and aptitudes necessary to do most jobs. *Id.* § 404.1522(b). An impairment is nonsevere "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1265 (11th Cir. 2019). To be severe, an impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509. A claimant has the burden of proving an impairment is severe. *Schink*, 935 F.3d at 1265.

3

Step two is a "threshold inquiry and allows only claims based on the most trivial impairments to be rejected." *Id.* (internal quotation marks omitted). It "acts as a filter" to eliminate claims involving no substantial impairment. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). A finding of any severe impairment satisfies step two. *Id.* Thus, an ALJ need not identify every severe impairment at step two. *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014); *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011).

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The RFC is used to decide whether the claimant can perform past relevant work and, if not, to decide whether there are other jobs in significant numbers in the national economy she can perform. *Id.* § 404.1545(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). In assessing the RFC, the ALJ must consider all impairments—severe and nonsevere. *Schink*, 935 F.3d at 1268.

To determine disability, the SSA considers a claimant's symptoms and the extent to which they "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Statements about symptoms alone cannot establish disability. *Id.* § 404.1529(a), (b). Objective medical evidence from an acceptable medical source must show a medical impairment that "could reasonably be expected to produce the … symptoms" and, when considered with the other evidence, would lead to a finding of disability. *Id.*

The finding that an impairment could reasonably be expected to produce the symptoms does not involve a finding on the intensity, persistence, or functionally limiting effects of the symptoms. *Id.* § 404.1529(b). For that finding, the ALJ considers all available evidence, including medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. *Id.* § 404.1529(a), (c).

The ALJ then determines the extent to which "alleged functional limitations and restrictions due to … symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how" the symptoms affect the ability to work. *Id.* § 404.1529(a). The ALJ's "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) (republished).

Factors relevant to evaluating the claimant's symptoms include: daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication to alleviate the symptoms; treatment for the symptoms other than medication; and measures used to relieve the symptoms. 20 C.F.R. § 404.1529(c)(3).

To determine the extent to which the claimant's symptoms affect her capacity to perform basic work activities, the ALJ considers statements about the intensity, persistence, and limiting effects of the symptoms; the statements in relation to the objective medical and other evidence; any inconsistencies in the evidence; and any conflicts between the statements and other evidence, including history, signs, laboratory findings, and statements by others. *Id.* § 404.1529(c)(4).

An ALJ must clearly articulate explicit and adequate reasons for rejecting a claimant's testimony about symptoms. *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995). A court will not disturb a clearly articulated finding about the claimant's symptoms if it is supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

"Narcolepsy is a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep" that range from a few seconds to thirty minutes. Soc. Sec. Admin., Program Operations Manual System, DI 24580.005. Other common symptoms are cataplexy attacks (loss of muscle tone that sometimes causes collapse and unconsciousness), hypnagogic hallucinations (hallucinations between sleep and wakening), and sleep paralysis. *Id.* Narcolepsy has no physical abnormalities, and except for sleep studies, laboratory studies will be normal. *Id.* Narcolepsy is "most frequently treated by the use of drugs[.]" *Id.*

Here, the ALJ found at step two that Amiel's narcolepsy was nonsevere, stating Amiel "did receive treatment for narcolepsy, but there is no evidence of persistent symptomatology or ongoing treatment with respect to this condition." Tr. 45.

At the hearing, Amiel testified she stopped working primarily due to fatigue. Tr. 81–83, 86, 92. She was diagnosed with narcolepsy. Tr. 82. When asked to describe the effects of narcolepsy on her functioning, she testified she never feels rested waking up. Tr. 86. She wakes up feeling like she is "drugged." Tr. 92. Despite trying to stay awake during the day, she typically naps for at least two or three hours a day. Tr. 87. She worries about driving because of the fatigue. Tr. 92. She drives "[v]ery rarely" and only about two miles. Tr. 95–96.

She stated, "I could literally be in the car at a stop light and close my eyes and take cat naps, just severe, severe fatigue." Tr. 83. She lacks the "stamina" to walk around the grocery store and load the groceries. Tr. 96. As to household chores, she testified, "I'm so weak and my stamina is so bad right now, I can't do very much without having to take breaks." Tr. 96. She may load the dishwasher on a "good" day and unload it on a "fantastic" day. Tr. 96. On a bad day, she is usually in bed or on the couch. Tr. 96. From March to June 2019, she kept a journal describing her "daily struggles." Tr. 94; *see* Tr. 312–17 (journal). The journal repeatedly references fatigue. *See* Tr. 312–17.

Contrary to the ALJ's finding, the record shows Amiel persistently exhibited narcolepsy symptoms and received ongoing treatment for it. She has been treated for her narcolepsy or fatigue by multiple doctors, including Dr. Robert Bevis, Dr. Mohamad Shahrour, Dr. Ann Winny, and Dr. Eric Lipson. The record shows Amiel began having "excessive daytime sleepiness" in 2016. Tr. 457. In April 2017, she told Dr. Shahrour the fatigue was "getting worse" and that she could "fall asleep anytime" and never feels refreshed. Tr. 457. In May 2017, she underwent a sleep study that showed frequent leg movements and poor sleep efficiency (55 percent efficiency) caused by frequent arousals (73 awakenings). Tr. 627–34. In June 2017, she told Dr. Winny the fatigue was "still significant." Tr. 472. Dr. Winny diagnosed her with "[s]evere fatigue of unknown etiology." Tr. 473. In February 2018, she told Dr. Shahrour she was still having severe fatigue and "fighting hypersomnolence all day." Tr. 339; *see also* Tr. 334 (February 2018 medical records by Dr. Winny showing fatigue was "present"). A few months later, she also told him she has had hypnagogic hallucinations and sleep paralysis. Tr. 349.

In April 2018, she underwent another sleep study and a multiple sleep latency test (MSLT). Tr. 635–39, 342–44 (sleep study); Tr. 640 (MSLT). The

sleep study showed a sleep efficiency of 67.5 percent, her "REM was severely delayed," and she experienced "[s]evere leg movements … throughout, with frequent associated arousals" (30 awakenings). Tr. 635, 639. The MSLT showed a short sleep latency (4.7 minutes). Tr. 402, 640. The polysomnographic technologist recommended caution when driving. Tr. 343.

A few days later, Amiel told Dr. Shahrour she was still "very tired" and hypersomnolent. Tr. 349. He diagnosed her with severe restless leg syndrome and narcolepsy without cataplexy. Tr. 350. In May 2018, she "was still having some hallucinations and occasional sleep paralysis." Tr. 363. Dr. Shahrour prescribed her armodafinil presumably for narcolepsy. Tr. 364. Shortly after, Dr. Bevis diagnosed her with "[n]arcolepsy due to underlying condition without cataplexy." Tr. 380 (emphasis omitted). In July 2018, she told Dr. Winny her fatigue was worse and sleep was poor. Tr. 383.

Despite taking medication, she continued to experience severe fatigue with generally no improvement. *See* Tr. 398 (December 2018 medical records showing that although treatment "seems to help," Amiel does not sleep well, she is "always fatigued," her sleep is "not restful," she "tosses in bed a lot," and her sleep is "always interrupted"); Tr. 663 (April 2019 medical records showing Amiel appeared tired and reported being tired); Tr. 313 (April 2019 journal entry stating, "Extremely tired and fatigued. I'm pretty much sleeping when I'm not working"); Tr. 313–16 (May 2019 journal entries stating, "Called out sick. I slept almost the entire 2 days I had off (Thursday/Friday). And still have no energy and feel lethargic. Just don't feel good. Not feeling it's safe to drive into work by myself"; "[F]eeling exhausted"; "Struggling today, Extreme exhaustion"; "Extremely fatigued again today. Seems to be normal for me"; "Sleeping 14–16 hours a day still. … There has to be something better to help with Narcolepsy"); Tr. 665 (May 2019 medical records showing Amiel "sleeps

8

well" but "has not been feeling well [and] is fatigued"); Tr. 317 (June 2019 journal entries stating, "Very tired and weak today" and "still feeling very weak and like I could pass out"; "Weak and shaky"). In June 2019, she stopped taking armodafinil and told Dr. Lipson she still felt fatigued, "despite taking medications." Tr. 687.

Dr. Bevis opined in August 2018 that Amiel is "unable to hold any meaningful position due to her profound fatigue and significant arthralgias and myalgias and poor concentration." Tr. 387. He added, "While we continue to treat her condition and hope for improvement I feel it is unrealistic to believe there will be a dramatic change in her status." Tr. 387. Dr. Bevis and Dr. James Shea (a physician who examined her in July 2019) both diagnosed her with narcolepsy and opined she exhibits "severe fatigue," defined as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." Tr. 698–701 (Dr. Bevis); Tr. 703–07 (Dr. Shea); *see also* Tr. 709–14 (Dr. Shea's examination report).

Substantial evidence does not support the ALJ's finding that Amiel's narcolepsy is nonsevere. Remand is warranted because the ALJ failed to adequately consider Amiel's fatigue in assessing the RFC and evaluating her symptoms.

The ALJ determined that Amiel's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." Tr. 49. In summarizing the evidence, the ALJ references Amiel's statements about fatigue. *See* Tr. 48–51, 53–54, 57. In explaining why Amiel's statements are

9

inconsistent with the evidence, the ALJ focused on the exertional limitations caused by her physical impairments and the mental limitations caused by her depression. *See* Tr. 59–60. The ALJ identified no inconsistencies between her statements about fatigue and the evidence, and none are apparent. *See generally* Tr. 48–60.*

Regarding Amiel's remaining argument, fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). Symptoms of fibromyalgia also include fatigue and "waking unrefreshed." *Id.* at *3. "[T]he symptoms and signs ... may vary in severity over time and may even be absent on some days." *Id.* at *5. Fibromyalgia "often lacks medical or laboratory signs" and "is generally diagnosed mostly on [an] individual's described symptoms." *Moore*, 405 F.3d at 1211. "Widespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work in one or more of the exertional categories[.]" SSR 12-2p, 2012 WL 3104869, at *6.

Considering that fatigue is a common symptom of fibromyalgia, reevaluation of Amiel's fatigue may affect the ALJ's evaluation of her

---

*As the Acting Commissioner asserts, any issue the plaintiff fails to raise or fully brief is waived. Doc. 29 n.3. Although Amiel did not specifically challenge the ALJ's assessment of her symptoms, she challenged the ALJ's finding at step two, which requires an evaluation of the RFC. A challenge to the RFC was thus implied and sufficiently raised. *See Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1269 (11th Cir. 2015) ("Though Henry does not specifically argue that the ALJ failed to develop a full and fair record, this argument falls within our review of his substantial evidence claim. Our jurisdiction encompasses not only those issues that a party expressly referred to but also those impliedly intended for appeal. It is impossible to review whether the ALJ's decision is supported by substantial evidence if the record is not fully and fairly developed." (internal quotation marks and citations omitted)).

10

fibromyalgia. The Court thus need not address Amiel's remaining argument that the ALJ failed to adequately consider her fibromyalgia.

The Court **reverses** the Acting Commissioner's decision under sentence four of 42 U.S.C. § 405(g) and **remands** the case to the Acting Commissioner to reconsider Amiel's narcolepsy and statements about fatigue, reconsider Amiel's fibromyalgia as necessary, and take any other appropriate action.

The Court **directs** the clerk to enter judgment for Cynthia Amiel and against the Acting Commissioner of Social Security and close the file.

**Ordered** in Jacksonville, Florida, on March 22, 2022.

_____

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

11